LINDA MILLER SAVITT, SBN 94164
*lsavitt@brgslaw.com*
JEFFREY P. FUCHSMAN, SBN 105651
*jfuchsman@brgslaw.com*
BALLARD ROSENBERG
    GOLPER & SAVITT LLP
10 Universal City Plaza, Sixteenth Floor
Universal City, California  91608-1097
Telephone:  (818) 508-3700
Facsimile:  (818) 506-4827

Nicholas L. DiVita, MO Bar No. 37514
*ndivita@bowse-law.com*
Jocelyn A. Villanueva, MO Bar No. 43448
*jvillanueva@bowse-law.com*
Stacey R. Gilman, SBN 186396
*sgilman@bowse-law.com*
Logan W. Overman, MO Bar No. 55002
*lwoverman@bowse-law.com*
Jennifer B. Wieland, SBN 223841
*jwieland@bowse-law.com*
BERKOWITZ OLIVER WILLIAMS
    SHAW & EISENBRANDT LLP
2600 Grand Boulevard, Suite 1200
Kansas City, Missouri  64108
Telephone:  (816) 561-7007
Facsimile:  (816) 561-1888

Attorneys for Defendants
H&R BLOCK MORTGAGE
CORPORATION and OPTION ONE
MORTGAGE CORPORATION

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION

| | |
|---|---|
| MELISSA SCHUELER, et al.,<br><br>Plaintiffs,<br><br>vs.<br><br>H&R BLOCK MORTGAGE CORPORATION, et al.,<br><br>Defendants. | CASE NO. SACV07-342 CJC (MLGx)<br><br>**DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DECERTIFY CONDITIONAL FLSA CLASS**<br><br>Date: May 21, 2009<br>Time: 1:30 P.M.<br>Courtroom: 9B<br>Hon. Cormac J. Carney |

# **TABLE OF CONTENTS**

Page No.

I.    INTRODUCTION ......................................................................... 1

II.   SUMMARY OF ARGUMENT .................................................... 2

III.  FACTUAL BACKGROUND......................................................... 5

    A.    The Parties ....................................................................... 5

    B.    Background on California Loan Officers ............................. 5

    C.    Payroll Policies and Timekeeping For Loan Officers .......... 7

    D.    Defendants' Expert Report ................................................. 9

IV.   ARGUMENT................................................................................ 10

    A.    The Governing Legal Standard for Tier 2 Analysis ............ 10

    B.    Plaintiffs Are Not Similarly Situated And The Court Should
        Decertify The Conditional FLSA Class ............................. 10

        1.    Plaintiffs Are Not Similarly Situated Because Their OTC
              Claims Arise Out Of Different Fact Patterns ........................... 10

        2.    Determining Liability Or Damages In This "Lost"
              Overtime Case Inherently Requires Individualized
              Inquiry ..................................................................... 13

        3.    Plaintiffs Cannot Show A Uniform "Policy" to Deny
              Overtime ................................................................... 16

        4.    The Defenses Available to the Defendants Are
              Individualized and Fact Specific .............................. 20

              a.    Purported Knowledge of Off-the-Clock Work ............. 20

              b.    Overreporting of Work Time ......................................... 22

              c.    Severance Agreements................................................... 22

        5.    Fairness and Procedural Considerations Cut Against
              Certification............................................................... 23

V.    CONCLUSION.............................................................................. 25

-ii-

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DECERTIFY CONDITIONAL FLSA
CLASS; CASE NO. SACV07-342 CJC (MLGx)

# TABLE OF AUTHORITIES

Page No.

**Cases**

*Alvarez v. IBP, Inc.*, 339 F.3d 894 (9th Cir. 2003) .................................................. 20

*Basco v. Wal-Mart Stores, Inc.*, 2004 WL 1497709 (E.D. La. 2004) ............. 18, 21

*Basco v. Wal-Mart Stores, Inc.*, 216 F. Supp. 2d 592 (E.D. La. 2002) ..............20

*Bayles v. Am. Med. Response of Colo., Inc.*, 950 F. Supp. 1053 (D. Colo. 1996) ......................................................................................... 17

*Beauperthuy v. 24 Hour Fitness USA, Inc.*, 2007 WL 707475 (N.D. Cal. 2007) ............................................................................................. 1

*Bernard v. Gulf Oil Corp.*, 841 F.2d 547 (5th Cir. 1988)....................................... 23

*Brooks v. BellSouth Telecomms., Inc.*, 164 F.R.D. 561 (N.D. Ala. 1995)................ 4

*Burk v. Contemp. Home Servs., Inc.*, 2007 WL 2220279 (W.D. Wash. 2007) ...... 13

*Carlstrom v. DecisionOne Corp.*, 217 F.R.D. 514 (D. Mont. 2003) ........................ 4

*Castle v. Wells Fargo Fin., Inc.*, 2008 WL 495705 (N.D. Cal. 2008).. 11, 13, 14, 18

*Champneys v. Ferguson Enters*. Inc., 2003 WL 1562219 (S.D. Ind. 2003)............. 1

*England v. New Century Fin. Corp.*, 370 F. Supp. 2d 504 (M.D. La. 2005) ... 13, 16

*Epps v. Oak Street Mortg. LLC*, 2006 WL 1460273 (M.D. Fla. 2006) ............ 14, 18

*Forrester v. Roth's I. G. A. Foodliner, Inc.*, 646 F.2d 413 (9th Cir. 1981) ............ 20

*Gjurovich v. Emmanuel's Marketplace, Inc.*, 282 F. Supp. 2d 91 (S.D.N.Y. 2003) ......................................................................................... 1

*Hinojos v. Home Depot, Inc.*, 2006 WL 3712944................................................ 4, 21

*Hipp v. Liberty Nat'l Life Ins. Co.*, 252 F.3d 1208 (11th Cir. 2001)...................... 17

*Internat'l Bhd. of Teamsters v. U.S.*, 431 U.S. 324 (1977)..................................... 17

*King v. West Corp.*, 2006 WL 118577 (D. Neb. 2006)........................................... 13

*Logan v. Zimmerman Brush Co.*, 455 U.S. 422 (1982) ......................................... 23

-iii-

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DECERTIFY CONDITIONAL FLSA
CLASS; CASE NO. SACV07-342 CJC (MLGx)

*Lusardi v. Xerox Corp.*, 118 F.R.D. 351 (D.N.J.1987) ............................................ 23

*Melong v. Micronesian Claims Comm'n*, 643 F.2d 10 (D.C. Cir. 1980) ................. 4

*Morisky v. Pub. Ser. Elec. & Gas Co.*, 111 F. Supp. 2d 493 (D.N.J. 2000) ............. 2

*O'Connor v. Boeing N. American, Inc.*, 197 F.R.D. 404 (C.D. Cal. 2000) ...... 22, 23

*Pfohl v. Farmers Ins. Group*, 2004 WL 554834 (C.D. Cal. 2004) ......................... 10

*Phillips Petroleum Co. v. Shutts*, 472 U.S. 797 (1985) ........................................... 23

*Ray v. Motel 6 Operating, L.P.*, 1996 WL 938231 (D. Minn. 1996) ............... 14, 18

*Reed v. Mobile County Sch. Sys.*, 246 F. Supp. 2d 1227 (S.D. Ala. 2003) ............. 13

*Simmons v. T-Mobile USA, Inc.*,  2007 WL 210008 (S.D. Tex. 2007) .................. 18

*Smith v. T-Mobile USA, Inc.*, 2007 WL 2385131 (C.D. Cal. 2007) ............... passim

*Thiessen v. General Electric Capital Corp.*, 267 F.3d 1095 (10th Cir. 2001) ........ 10

*Thompson v. Speedway SuperAmerica LLC*, 2009 WL 130069 (D. Minn. 2009) ........................................................................................................... 13, 19

*Walker v. Mountain States Tel. & Tel. Co.*, 1988 WL 1000060 (D. Colo. 1988) ................................................................................................................. 23

*West v. Border Foods, Inc.*, 2006 WL 1892527 (D. Minn. 2006) ......................... 18

*Williams v. Accredited Home Lenders, Inc.*, 2006 WL 2085312 (N.D. Ga. 2006) ............................................................................................. 14, 15, 21, 25

**Statutes**

29 U.S.C. § 260 ....................................................................................................... 20

29 U.S.C. § 216(b) ..................................................................................................... 1

## MEMORANDUM OF POINTS AND AUTHORITIES

Defendants H&R Block Mortgage Corp. and Option One Mortgage Corp. ("Defendants") hereby offer the following Memorandum of Points and Authorities in support of their motion to decertify the conditional FLSA class (the "Motion").

### I.    INTRODUCTION

Plaintiffs have had over a year to develop a record to support collective action treatment under Section 216(b) of the Fair Labor Standards Act ("FLSA") for their "off the clock work" claims for overtime compensation.  If anything, Plaintiffs' case for collective action treatment is weaker now than it was about a year ago, when it passed muster for conditional certification under an admittedly "lenient" standard. Under the stricter scrutiny that should now be applied by the Court, Defendants respectfully request that the Court vacate its January 24, 2008 Order (Docket No. 66) and prohibit this case from proceeding as a collective action.

Unlike a "job misclassification" case that may be more amenable to collective action treatment under Section 216(b),[1] this is an off the clock ("OTC") work case seeking damages for unpaid overtime work.  The distinction is key.

Most courts find that OTC overtime cases brought under FLSA Section 216(b) do not lend themselves well to collective action treatment, and thus deny

---

[1]  The "job classification" cases in which exempt employees challenge their exempt status are typically more amenable to collective treatment because there the plaintiffs are challenging class-wide policies regarding job classification, and evaluation of the plaintiffs' claims depends on common proof.  *See, e.g., Beauperthuy v. 24 Hour Fitness USA, Inc.,* 2007 WL 707475 (N.D. Cal. 2007); *Gjurovich v. Emmanuel's Marketplace, Inc.,* 282 F. Supp. 2d 91 (S.D.N.Y. 2003); *Champneys v. Ferguson Enters. Inc.,* 2003 WL 1562219 (S.D. Ind. 2003).

certification.  Courts deny FLSA certification in OTC overtime cases because more often than not, individual issues predominate such that the employees are not "similarly situated."  This case is no exception.

On January 24, 2008, the Court granted conditional certification of the FLSA claims, under the more lenient "Tier 1" standard.  (Docket No. 66 at 4-5)  The Court observed that it was applying a "lenient" standard to the ability of plaintiffs to show a "common policy" and to the issue of whether plaintiffs are "similarly situated." As the Court's conditional certification order envisioned, notice was provided, and 175 of 563 persons opted in to the lawsuit.  (Docket Nos. 110, 111, 116, 122).   The parties conducted significant discovery, and fact discovery has closed.  Defendants now move to decertify the FLSA claims and urge the Court to apply the more demanding Tier 2 scrutiny to Plaintiffs' request for collective action treatment given the more robust record now available.[2]

## II.     SUMMARY OF ARGUMENT

Defendants' Motion should be granted for a series of inter-related reasons:

1.     Plaintiffs cannot show they are "similarly situated."   The named Plaintiffs' claims for OTC compensation differ from one another and differ from the claims of those persons who opted in.  The claims differ over time, across offices

---

[2] Because the court generally has a limited amount of evidence before it, the initial determination ("Tier 1") is made under a fairly lenient standard and commonly results in conditional class certification. (Docket No. 66 at 4)  At Tier 2, "the court has much more information on which to base its decision and, as a result, [it] employs a stricter standard." *Morisky v. Pub. Ser. Elec. & Gas Co.*, 111 F. Supp. 2d 493, 497 (D.N.J. 2000).

and vary depending on which sales manager was supervising which plaintiff, at any given point in time.

2.    Adjudicating liability or damages in an OTC case like this raises a host of inherently individualized questions: *did Plaintiff work at the time in question, fail to accurately record his or her time, and if so, when, how much and why?*  These issues will inevitably have to be tried and are particularly difficult to resolve in this case, where loan officers could set their own schedules and come and go from the office at will.

3.    Plaintiffs cannot show any uniform, systematized corporate policy to deny overtime.  Far from it, the only *official*[3] policy required loan officers to record all time worked (so that they could be paid for all time recorded), and the statistical data shows *different loan officers in different offices under different sales managers recorded and were paid for overtime*, undermining the notion of any "policy" to deny overtime.  Uncontradicted findings by Defendants' highly credentialed expert, Dr. Michael Ward, found statistically significant variation in the reporting of overtime, across offices and sales managers, negating any "policy" asserted by plaintiffs.[4]  Furthermore, the "policies" claimed by Plaintiffs to have been imposed themselves *varied*, as they reflected the individual experiences of those Plaintiffs.  For some, the claimed "policy" was "no overtime, period," while others suggested

---

[3] See III(C) herein at 7-9.

that approval for overtime was unreasonably withheld.  Still others suggested that the "policy" at first was "no overtime," but that the policy changed in 2007. Other testimony also demonstrates how the "policy" differed from sales manager to sales manager, over time and from office to office - - named Plaintiff Schueler at first reported and was paid overtime for several months after her employment began, but then abruptly stopped when a new sales manager began to supervise her in 2005.

4.    Defendants have individualized defenses to the FLSA claims, including that 166 loan officers signed severance agreements acknowledging receipt of wages owed, sales managers were unaware of alleged underreporting and some loan officers overreported their time.  Some loan officers will challenge the severance agreements, others may not, and named Plaintiffs, none of whom signed severance agreements, lack standing to represent those opt-in plaintiffs who did sign them.[5] Nor can they challenge the enforceability of the severance agreements when they themselves did not sign them.[6]

5.    This case would be utterly unmanageable to try as a collective action because there is no efficient or fundamentally fair way to identify, let alone measure, Plaintiffs' alleged "lost" overtime.  Plaintiffs admit falsely or incorrectly reporting

---

[4] Similar testimony by Dr. Ward motivated another court to deny collective action treatment in another FLSA case. *Hinojos v. Home Depot, Inc.*, 2006 WL 3712944, at *1-2 (D. Nev. 2006) (analysis showing variation across stores).

[5] *Brooks v. BellSouth Telecomms., Inc.*, 164 F.R.D. 561, 569 (N.D. Ala. 1995).

[6] *Melong v. Micronesian Claims Comm'n*, 643 F.2d 10, 15-16 (D.C. Cir. 1980), *cert. denied*, 419 U.S. 996 (1981) (denying class certification where plaintiff who did not sign a release sought to represent those who did); *Carlstrom v. DecisionOne Corp.*, 217 F.R.D. 514 (D. Mont. 2003).

1   time worked on many occasions, and apparently insist that the Court should accept

2   their unrecorded, anecdotal recollections.   Complicating matters is the presence of

3   another data set altogether – records of telephone system log in activity – which

4   represents yet another inherently individualized source of proof of the existence or

5   non-existence of OTC work.   Juxtaposing three highly varied information sources

6   (anecdotal, time entry and telephone log) is anything but the basis of common proof.

7

8       With these points in mind, Defendants first sketch the factual background

9   pertinent to the Court's Tier 2 analysis.

10              **III.   FACTUAL BACKGROUND**

11      **A.   The Parties**

12      Defendants operated a mortgage loan business at various locations nationally,

13  including in the state of California.   (FAC ¶¶ 10, 11, Docket No. 80; First Amended

14  Answer ¶¶ 10, 11, Docket No. 124)   Since late 2007, Defendants are no longer

15  operating entities, at least in their pre-lawsuit form.[7]   (Fox Decl. ¶ 7; App. at 13)[8]

16  Plaintiffs are former loan officers who were employed by the Company in the State

17  of California.   (FAC ¶¶ 5-9)

18

19      **B.   Background on California Loan Officers**

20      Defendants had at least 13 office locations throughout California, and some

21  751 loan officers working at those offices from March 2003 through September

22

23  ――――――――――――――

24  [7] In late 2007, following adverse turns in the real estate market, Defendants shut down loan origination operations but continued some loan servicing business. (Fox Decl. ¶ 7; App. at 13)

-5-

25

2007.   (Villanueva Decl. ¶ 3; App. at 3)   Loan officers were organized into teams, each with a "team lead" or "sales manager."   (Fox Decl. ¶ 5; App. at 10-11)   The team lead served as supervisor for the team and had discretion to manage its day to day business.   (*Id.*)   Thus, teams generally operated as independent units on a day to day basis.   (Vaillancourt 94:1-4; App. at 59)

A loan officer is essentially a sales position – loan officers take calls from prospective borrowers and attempt to sell loan products.   (Schueler Decl. ¶ 5; App. at 64-65)   If the caller wants to proceed, the loan officer initiates loan paperwork and works with appraisers, loan processors and underwriters, among others, to get the loan closed.[9]   (Lorts 60:18-61:12; 63:11-23; App. at 79-80; Vaillancourt 15:14-24; 18:7-19:17; App. at 54-55)   Loan officers were required to close a certain number of loans per month, to meet production goals.   (Schueler Decl. ¶ 9; App. at 66; Fox Decl. ¶ 12; App. at 18-19)

Loan officers in the loan origination business were divided into two groups: CRG ("customer retention group") and CAG ("customer acquisition group").   (Fox Decl. ¶ 4; App. at 10)   CRG loan officers took calls from borrowers who had already done business with Defendants or their affiliates, while CAG loan officers took calls from "new" customers.   (*Id.*)   Typically, loan volume and production requirements

---

[8] An Appendix of Exhibits ("App.") containing the Declaration of Jocelyn A. Villanueva and attached excerpts of declarations, deposition transcripts and other documents is filed contemporaneously herewith.   For the Court's convenience, the fact cites here refer to specific pages in the App.

[9] Depending on the customer, the initial "sign up" process could be completed in a single call, but the majority of the time, multiple calls were required.   (Lorts 63:11-64:19; App. at 80)

for CRG were greater than CAG.  (*Id.*)  The three named Plaintiffs were CRG loan officers at the Irvine/Lake Forest office. (Fox Decl. ¶ 6;  App. at 12-13; Schueler Decl. ¶ 2; App. at 64; Figueroa Decl. ¶ 1; App. at 86; Karalis Aff. ¶ 1; App. at 91)

The work atmosphere for loan officers was open, dynamic and flexible.  Loan officers generally had flexible schedules (that is, they did not have to "punch a clock") and they could come and go from their desks or the office building as they pleased.  (Sathoff 65:13-22; App. at 98)  Loan officers could also attend to personal matters while at the office or could leave the office for personal reasons when they desired.  (Karalis 69:19-70:11; App. at 107-108; Schueler 133:17-134:6; App. at 140-141)

### C.    Payroll Policies and Timekeeping For Loan Officers

For the relevant period, California loan officers were classified as "non-exempt" for FLSA purposes, and were therefore eligible for overtime.  (Fox Decl. ¶ 11; App. at 16)  Loan officers were paid an hourly wage and commissions, and the commissions were based on loan production.[10]  (*Id.*)

Defendants' pay policies were set forth in its Associate Handbook, and loan officers were paid in accordance with the time *they themselves entered* in the computerized time entry system called Peoplesoft. (Fox Decl. ¶ 11; App. at 16;

---

[10] During the 2004-2007 timeframe, loan officers (including some Plaintiffs) had healthy incomes, and some made over $200,000 annually.  (Figueroa 172:16-18; 173:2-20; App. at 33; Agnell 46:25-47:3; App. at 37)

Karalis 19:23-20:15; App. at 105)   Defendants' policies required loan officers to record their time worked accurately:

**Time Reporting and Attendance Tracking Policy**

> The Company is required by law to keep accurate records of the actual hours worked for our associates.  *You are therefore responsible for accurately reporting your time in Peoplesoft.*
>
> If you are a non-exempt associate, *you must enter all time worked into Peoplesoft* on a daily basis, including punching in and out each day for your lunch period.  All hours to be paid must be entered in the appropriate field…
>
> *If you have questions about time reporting or attendance tracking, please talk to your Team Leader, Manager, or contact our Payroll department.*  Failure to accurately report your time will subject you to disciplinary action, up to and including termination of employment.

(Associate Handbook, Karalis Dep. Ex. 5 at P581; App. at 119)

> **Overtime Policy**
>
> If you are eligible for the payment of overtime, *you will be paid for actual hours worked.*  Time off, such as vacation, sick time and holiday time, will not apply toward the calculation of overtime payments.
>
> You will be paid for all hours worked in accordance with State and Federal requirements. *You should record your time worked in Peoplesoft…*
>
> When the need arises to work overtime, the Company will endeavor to give you as much advance notice as possible.  If you need to work overtime you must get approval in advance from your Team Leader or Manager.  If you are non-exempt and you work unauthorized overtime, you will be subject to disciplinary action, up to and including termination of employment.

(Associate Handbook, Karalis Dep. Ex. 5 at P580; App. at 118)

After recording their time, loan officers submitted their time records to their sales manager.  (*Id.*)  The sales managers reviewed and approved the time records and sent them on to Payroll for processing and eventually the issuance of

-8-

paychecks.[11]  (*Id.*; Sathoff 42:4 to 43:1; App. at 95)   Loan officers were trained on the use of the time entry system during orientation.  (Lorts 20:2-15; App. at 74; Agnell 75:8-25; App. at 40)  Sales managers, Human Resources ("HR") and Payroll were available for further questions about payroll issues or other policies.  (Sathoff 63:7 to 64:6; App. at 98; Associate Handbook, Karalis Dep. Ex. 5 at P581; App. at 119)  Further, the Company had an "open door policy" and provided employees a telephone hotline so they could report any work issues or complaints *anonymously*. (Associate Handbook, Dep. Ex. 5 at P572; App. at 117; Professional Conduct Policy, Karalis Dep. Ex. 6 at P158; App. at 121)

### D.    Defendants' Expert Report

On December 19, 2008, Defendants served their expert report.[12]  Defendants' expert found, among other things, that: (i) there was statistically significant variation in the incidence and number of overtime hours reported, across offices and sales managers (Expert Report ¶¶ 10-15; App. at 163-64); and (ii) that the average time logged on the telephone system (*see* IV(B)(3) herein), was 8.95 hours per day and the average time entered on the time entry system was 8.13 hours per day.  (*Id.* ¶ 18; App. at 164-65)  With an hour for lunch, the average time logged on the telephone system was consistent with the average time recorded on the time entry system.  (*Id.*)

---

[11] Sometimes a sales manager had to adjust time for errors and would assist loan officers with correcting entries. (Sathoff 48:17-49:2; 58:6-18; App. at 96-97)

[12] Defendants' Expert Report is attached as Exhibit 14 to the Villanueva Declaration, in the App.

# IV.   ARGUMENT

## A.   The Governing Legal Standard for Tier 2 Analysis

This Motion seeks the decertification of a conditionally certified class under the FLSA, and thus involves a "Tier 2" analysis.   At "Tier 2," a more rigorous standard than Tier 1, the Court must make a factual determination regarding whether plaintiffs are "similarly situated" and must consider the following factors: (1) the disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to the defendants with respect to the individual plaintiffs; and (3) fairness and procedural considerations. *Pfohl v. Farmers Ins. Group,* 2004 WL 554834, at **2-3 (C.D. Cal. 2004) (citing *Thiessen v. General Electric Capital Corp.,* 267 F.3d 1095, 1103 (10th Cir. 2001)).   Plaintiffs bear the burden of proving they are "similarly situated."   *Pfohl,* 2004 WL 554834, at *2.   Should the court determine on the basis of the complete factual record that the plaintiffs are not "similarly situated," then the court may decertify the class. *Id.* at *3.

## B.   Plaintiffs Are Not Similarly Situated And The Court Should Decertify The Conditional FLSA Class

### 1.   Plaintiffs Are Not Similarly Situated Because Their OTC Claims Arise Out Of Different Fact Patterns

Typically in OTC cases, plaintiffs assert a "common" allegation that defendant unlawfully required them to perform OTC work and denied them overtime.   *See, e.g., Smith v. T-Mobile USA, Inc.,* 2007 WL 2385131, at *5 (C.D. Cal. 2007).   However, those kinds of general allegations fail to meet the Tier 2

-10-

standard, since different fact patterns may underlie the purportedly "common" allegation of denied overtime. *Id.*; *Castle v. Wells Fargo Fin., Inc.*, 2008 WL 495705, at *5 (N.D. Cal. 2008) (variety of different circumstances under which declarants were allegedly required to work unpaid overtime weighs against certification). Likewise, here, while Plaintiffs generally assert that they were "forced" to underreport overtime, each had different experiences in this regard, including the frequency and time frame in which overtime was reported and instructions allegedly received from sales managers. Take these examples:

Plaintiff Schueler was employed from August 2004 through May 2006 in the Lake Forest/Irvine office. (Schueler Decl. ¶ 2; App. at 64)  She recorded and was paid overtime from August 2004 through early 2005, when her sales manager was Pat Stafford. (Schueler 64:14-21; App. at 136)[13]  Schueler claims, however, that everything changed when she got a new sales manager, Glen Reneau, and she stopped recording overtime. (*Id.* at 86:25-87:13; App. at 137)  Upon Reneau's arrival, Schueler claims she *believed* she could no longer record overtime.[14] (Schueler 144:7-145:6; App. at 142)

Plaintiff Figueroa was employed from July 2002 through May 2007 in the Lake Forest/Irvine office. (Figueroa Decl. ¶ 1; App. at 86)  He claims that he was

---

[13] Sales manager Stafford never told Schueler that she was not permitted to record overtime. (Schueler 86:9-12; App. at 137)  During the time that Stafford was her sales manager, Schueler asserts her time entry records were an accurate reporting of the hours she worked. (Schueler 144:22-145:2; App. at 142)

[14] That is, while Schueler admits Reneau told her to ask for advance approval of overtime, she admits she failed to ever ask. (Schueler 196:10-197:2; App. at 146)

never permitted by management to record overtime.   (Figueroa Resp. to First Interrogatories at 9-12; App. at 187-90)   However, Figueroa's Associate Earnings Report shows he recorded overtime on three occasions in 2006 and 2007. (Defendants' production 9216-17; App. at 192-93)

Plaintiff Karalis was employed from January 2005 through May 2006 in the Lake Forest/Irvine office.   (Karalis Aff. ¶ 1; App. at 91) He claims the Company policy was "no overtime, period" and recorded no overtime.[15]   (Karalis 126:15-19; App. at 115)   Despite the purported "policy," Karalis admitted that other loan officers *on his team* may have been paid overtime and that he did not know their circumstances.  (Karalis 130:3-22; App. at 115A)  Karalis never requested approval to work overtime.  (Karalis 123:17-19; App. at 114)

Contrary to the named Plaintiffs, opt-in Plaintiff Agnell *recorded and was paid overtime in over 30  pay periods*, from 2003-2006.  (Agnell 60:6-11, Dep. Ex. 9; App. at 38, 41-51)  Agnell worked in the same office (Lake Forest/Irvine) as the named Plaintiffs but for different sales managers.  (Agnell 33:8-10; App. at 36)[16] Thus, in this case, Plaintiffs chose to report overtime at different times, in different frequencies, and under different sales managers.

Such disparities in the alleged factual backdrop for the recording of overtime support a denial of certification here.   A group of opt in plaintiffs "subject to

---

[15] Karalis also claimed his sales manager Dani Ulloa "cut" his time on occasion but did not see her do it. (Karalis 101:15-18; 114:25-115:6; App. at 109, 112)

-12-

different job actions with various decisions by different supervisors made on a decentralized, employee by employee, or team by team basis cannot be certified as a collective class." *King v. West Corp.*, 2006 WL 118577, at *15 (D. Neb. 2006); *see also Reed v. Mobile County Sch. Sys.*, 246 F. Supp. 2d 1227, 1237 (S.D. Ala. 2003) (the evidence fails to "reflect that this has happened with sufficient frequency and breadth as to suggest a pattern or practice even within the interviewee's own school, much less defendant-wide"). The different factual circumstances presented are dispositive of why Plaintiffs are not "similarly situated."

### 2. Determining Liability Or Damages In This "Lost" Overtime Case Inherently Requires Individualized Inquiry

In "lost" overtime cases such as this, recent federal decisions have almost uniformly denied class treatment. *See Castle v. Wells Fargo Fin., Inc.*, 2008 WL 495705, at **6-7 (N.D. Cal. 2008) (denying conditional certification); *Thompson v. Speedway SuperAmerica LLC*, 2009 WL 130069, at *13 (D. Minn. 2009) (denying conditional certification); *Smith v. T-Mobile USA, Inc.*, 2007 WL 2385131, at *8 (C.D. Cal. 2007) (denying conditional certification); *Burk v. Contemp. Home Servs., Inc.*, 2007 WL 2220279, at **2-3 (W.D. Wash. 2007) (denying certification of off-the-clock claim); *England v. New Century Fin. Corp.*, 370 F. Supp. 2d 504, 507 (M.D. La. 2005) (denying conditional certification).

The common thread in these cases is that determining liability (or damages) in a "lost" overtime case is not amenable to class treatment. *Smith*, 2007 WL

---

[16] Compare the declarations of named Plaintiffs and Agnew at ¶ 1. (Docket Nos. 59-5, 59-10 and 59-18 with 59-2)

2385131, at *8 (given the nature of plaintiffs' claims and defenses, classwide proof not available).   For example, determining liability in this case will raise these issues, among others: (i) did Plaintiff work on the day or at the time in question; (ii) did Plaintiff fail to record his or her time worked accurately; (iii) how many hours, if any, did Plaintiff work off the clock; and (iv) why.[17]   Individualized inquiry will be necessary to answer these questions if fundamental fairness is to be observed.   No common proof exists to prove these questions in this case in any rational or coherent manner.  *Cf. Ray v. Motel 6 Operating, L.P.*, 1996 WL 938231 (D. Minn. 1996) (because the level of overtime varied for each plaintiff, there existed a "lack of commonality for damages").

Plaintiffs' responsibility to record their own time for payroll purposes further supports decertification because the decision to "underreport" is inherently individualized.  *See supra* at III(C).  *Williams v. Accredited Home Lenders, Inc.*, 2006 WL 2085312, at *1, *4 (N.D. Ga. 2006) (denying certification where loan officers responsible for filling out their own time cards); *Epps v. Oak Street Mortg. LLC*, 2006 WL 1460273, at **6-7 (M.D. Fla. 2006) (decertifying class where loan officers recorded own time); *see also Castle*, 2008 WL 495705, at *1.

Here, the factfinder can only resolve a Plaintiff's claims by evaluating the particular circumstances of that individual.  This would be particularly challenging

---

[17] Indeed, Plaintiffs are relying on memory to figure the amount of alleged overtime "lost."  (*See, e.g.*, Lorts 35:23-36:8; App. at 77; Karalis 67:12-68:6; App. at 107)

in a case such as this, where loan officers (i) could come and go from the office as they pleased; (ii) could and did attend to personal affairs while at the office; (iii) recorded their own time and were not required to "punch a clock;" and (iv) were paid overtime from time to time.

Take, for example, the case of opt-in Plaintiff Joey Lorts and named Plaintiff Schueler.  Their situations illustrate the fact specific nature of the pivotal issue – were these individuals working at the time in question?   To begin, a teammate of Lorts stated that Lorts regularly left the office to go to a personal trainer.  (Deacy Decl. ¶ 8; App. at 131)  Further, Lorts' sales manager testified that he made a point to check on Lorts because of attendance issues, and Lorts would be "gone."  (Sathoff 90:4-91:24; App. at 99)  Similarly, named Plaintiff Schueler admitted that during work, she would communicate with bank officials and brokers for her personal, real estate "flipping" business. (Schueler 113:24-114:13; 133:17-134:6; App. at 138-41; Schueler Supp. Responses to First Interrogatories at 21-22; App. at 207-08)  If this is true for them, for how many other individuals is it also true?  This is not the factual predicate for a collective action.  *Accredited Home Lenders*, 2006 WL 2085312 at *4 (certification denied where claim requires "fact-specific, individualized inquiry into each plaintiff's *day-to-day* activities").

### 3.   Plaintiffs Cannot Show A Uniform "Policy" to Deny Overtime

Courts will deny certification where plaintiffs fail to show a common policy to violate the FLSA. *See, e.g., England*, 370 F. Supp. 2d at 507.  Here, Plaintiffs will try to argue that there was a uniform "policy" to deny overtime, but their argument must fail.  First, how could there be a "policy" to deny overtime if in fact *different loan officers in different offices under different sales managers recorded and were paid for overtime*?

Analysis of the statistical data supports this point and rejects Plaintiffs' contentions.  Defendants' Expert Report shows that approximately 63% of loan officers in the putative class recorded and were paid overtime at some point during the relevant period.[18]  (Expert Report ¶¶ 9, 10-15; App. at 163-64)  Dr. Ward also found that there was a *statistically significant variation* in the reporting of overtime, across different offices and different sales managers. (*Id.*)

Moreover, Dr. Ward found that if loan officers took a meal break without logging out of the telephone system (as most loan officers did according to that data), the data suggests any level of unrecorded time *approaches zero, on average*. (Expert Report ¶ 18; App. at 164-65) (showing the average time logged on the telephone system was 8.95 hours per day and the average time entered on the time

---

[18] The "putative class" as used herein refers to the putative class for the California claims (some 751 loan officers) and thus is a larger group than the FLSA opt-in class.  Defendants paid some $502,282.44 in overtime wages and $2,761.51 in double time wages to California loan officers during the relevant period, according to calculations made in January 2008.  (*See* Fox Decl. ¶ 14; App. at 19)

-16-

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DECERTIFY CONDITIONAL FLSA CLASS; CASE NO. SACV07-342 CJC (MLGx)

entry system was 8.13 hours per day).  Plaintiffs may dispute this, but it is yet another example of the many of individualized questions this case raises on the FLSA claim and another reason why no corporate policy to deny overtime can be said to exist. *Cf. Bayles v. Am. Med. Response of Colo., Inc.*, 950 F. Supp. 1053 (D. Colo. 1996) (court concluded, after the completion of discovery, that the action was "fraught with questions regarding distinct proof as to individual plaintiffs. Issues requiring individualized proof, such as call volume, sleep habits, conditions at particular stations, and treatment under [the employer's] mealtime policy dominate plaintiffs' claims.").

While Plaintiffs may identify individual instances of a purported "policy," they have no means to dispute Defendants' Expert's analysis of the *data as a whole*.   To prove a "policy," the Plaintiffs must show that FLSA violations were "the company's standard operating procedure - the regular rather than the unusual practice." *Internat'l Bhd. of Teamsters v. U.S.*, 431 U.S. 324, 336 (1977). Isolated or sporadic violations are *not* sufficient to meet this standard. *Id.*   While FLSA plaintiffs may attempt to meet this standard through the use of statistical analysis, *see Hipp v. Liberty Nat'l Life Ins. Co.*, 252 F.3d 1208, 1228 (11th Cir. 2001), Plaintiffs here have no such statistical analysis in the record.  Rather, they have isolated anecdotal testimony.

Second, not only the statistical analysis, but Plaintiffs' claims themselves undermine the notion of a uniform "policy."  Some Plaintiffs say the "policy" was

-17-

"no overtime, period," (*e.g.*, Karalis 22:2-8; 124:12-23; App. at 106, 114), while some suggest it was approval for overtime was unreasonably withheld (Lorts 23:1-12; App. at 75),[19] some indicate that overtime could not be worked during the initial training period (Schueler 241:9-12; App. at 148A) and still others suggest that the policy at first was "no overtime" but that the policy changed in 2007 (Badorek 30:2-17; App. at 154).  These divergences alone support the denial of certification.  *Wells Fargo*, 2008 WL 495705, at *5 (denying conditional certification where plaintiffs described differing company "policies" on overtime).

Third, to the extent Plaintiffs assert the Company's "policy" was to "discourage" reporting overtime, that is not enough to justify certification. [20] "Even assuming that [defendant] had a corporate policy of discouraging overtime, each…Plaintiff's proof of a violation will be individualized because it depends upon how or whether each individual manager implemented the policy with regard to each individual plaintiff."  *Epps*, 2006 WL 1460273, at *7; *see also Smith*, 2007 WL 2385131, at *5.

---

[19] Such a claim would fail in any event because overtime was paid to some loan officers without prior approval (*e.g.*, Vaillancourt 57:23-58:9; App. at 56-57), and some overtime was paid to loan officers with prior approval (*e.g.*, Potter Decl. ¶ 5; App. at 212).

[20] A "policy to keep employee wage costs low" is not "sufficient proof to justify the creation of a [§ 216(b)] class." *Basco v. Wal-Mart Stores, Inc.*, 2004 WL 1497709, at *7 (E.D. La. 2004); *see Simmons v. T-Mobile USA, Inc.*, 2007 WL 210008, at *5 (S.D. Tex. 2007); *West v. Border Foods, Inc.*, 2006 WL 1892527 (D. Minn. 2006); *Ray v. Motel 6 Operating L.P.*, 1996 WL 938231, at *4-6 (D. Minn. 1996). The corporate desire to minimize or avoid overtime is not enough to conclude that plaintiffs are "similarly situated" particularly when there has been no showing that "the potential conflict between [work expectations] and a policy discouraging overtime affects [employees] in different stores equally, or even a meaningful number of [employees]." *Simmons*, 2007 WL 210008, at *6.

Fourth, Plaintiffs may argue that the Company's "policy" was to set production goals at levels which required overtime (which would be denied), but that argument also fails.  As shown in this section *supra*, there was no uniform policy to deny overtime.  Further, while some loan officers claimed they had to work overtime to meet production goals, others say that overtime was *not* required.  (*e.g.*, Nguyen Decl. ¶ 5; App. at 169)  Moreover, some Plaintiffs admitted it was possible to meet production goals *without* working overtime and that productivity was dependent on numerous variables, such as the nature of the customer, industry conditions, abilities of the loan officer, and the competency of the sales manager and loan processing staff.[21]   (Lorts 69:13-70:1; 74:2-15; App. at 81-83; Vaillancourt 93:14-17; App. at 58; Schueler 162:12-19; App. at 144; Karalis 68:23-69:16; App. at 107)

In short, Plaintiffs have failed to show evidence of a centralized policy "to violate the policy" in this case.  That some loan officers were not paid overtime could be for any number of reasons.  *See Thompson*, 2009 WL 130069, at *3 (plaintiffs failed to show "corporate decision" to violate stated policies of company). Far from showing the impact of a uniform edict issued from high levels of company management, the record in this case if anything displays a notable diversity and variation in the reasons anyone ever allegedly failed to report overtime.

---

[21] Some Plaintiffs testified that failing to meet loan production requirements would not result in termination in any event.  (Badorek 43:14-23; 49:18-50:2; App. at 155-56)

-19-

### 4.     The Defenses Available to the Defendants Are Individualized and Fact Specific

Another reason courts regularly decline to certify OTC classes is because employers are entitled to raise individualized and fact-specific defenses.  *See Basco v. Wal-Mart Stores, Inc.*, 216 F. Supp. 2d 592, 603 (E.D. La. 2002).  In defense of Plaintiffs' claims, Defendants will, at a minimum:

* contest whether any of the Plaintiffs worked OTC and show some Plaintiffs *overreported* work time, from time to time;

* contest whether any of the Plaintiffs worked more than 40 hours per week without receiving overtime pay;

* show that sales managers were not aware of OTC work;

* show that Plaintiffs violated the policies for accurately recording time;

* show that Plaintiffs did not take advantage of opportunities to complain and cure any claimed pay deficiencies;

* show that sales managers acted in good faith;[22] and

* show that certain Plaintiffs signed severance agreements.

### a.     Purported Knowledge of Off-the-Clock Work

An employer does not violate the FLSA if it has no knowledge that an employee is working overtime.  *Forrester v. Roth's I. G. A. Foodliner, Inc.*, 646 F.2d 413, 414-15 (9th Cir. 1981).  Here, despite having multiple means to bring overtime issues to the attention of HR or Payroll (*see* III (C) *supra*), Plaintiffs failed

---

[22] A court may deny or reduce an award of liquidated damages under the FLSA if the employer shows that, "'despite the failure to pay appropriate wages, the employer acted in subjective 'good faith' and had objectively 'reasonable grounds' for believing that the acts or omissions giving rise to the failure did not violate the FLSA.'" *Alvarez v. IBP, Inc.*, 339 F.3d 894, 909 (9th Cir. 2003); 29 U.S.C. § 260.

to do so.   (*E.g.,* Karalis 19:14-16; App. at 105)   Further, the question of "knowledge" is highly individualized.   Whether a particular sales manager, in a particular office, during a particular time, instructed his/her loan officers to disregard Company policy will necessarily impact the success of each Plaintiff's claim. *Accredited Home Lenders*, 2006 WL 2085312, at *4 ("every employee must testify about his awareness of the overtime policy, and his violation of that policy - and whether it was compelled by his or her branch manager").   This is at odds with a collective action.

For example, named Plaintiff Schueler testified that her sales manager Glen Reneau advised her to "come to him" if she ever found herself needing to work overtime. (Schueler 196:19-23; App. at 146)   Schueler, however, admitted she failed to ever seek approval from Reneau, even though she now claims she worked as much as 15 hours of overtime per week.[23]   (Schueler 196:24-197:2; App. at 146) Regardless of who is right and who is wrong on this key issue of contested fact, this is not the stuff of class certification.   Cross-examination and manager and possibly subordinate employee testimony will be necessary to resolve these contrary statements.   *See Basco,* 2004 WL 1497709, at *8; *Smith,* 2007 WL 2385131, at *7-8; *Hinojos,* 2006 WL 3712944, at *2.

---

[23] Schueler further admitted she was *not* told not to record overtime by any manager above Mr. Reneau.   (Schueler 197:8-23; App. at 146)

### b.   Overreporting of Work Time

These inquiries become even more involved and individualized when the Court considers *overreporting* of work time.[24]   For example, the time entries for named Plaintiff Karalis reflect that he worked full days on two holidays – Thanksgiving and Labor Day, 2005.  (Karalis 119:1-13; App. at 113; Karalis Dep. Ex. 8 at 8629, 8635; App. at 125-26)  However, Karalis does not recall working on those holidays.  (*Id.*)  Further, Schueler admitted she overreported time, as her sales manager instructed her to correct her time where she recorded a full day on a day off.  (Schueler 178:10-179:2; App. at 145; Schueler RFA 16; App. at 232-33)  An analysis of whether each Plaintiff overreported time would be required in determining any Plaintiff's claim.

### c.   Severance Agreements

As indicated *supra*, 166 loan officers in the putative class (and 51 of the FLSA opt-ins) accepted severance checks and signed severance agreements in late 2007.  (Villanueva Decl. ¶ 4; App. at 2)  Not only do the agreements contain a general release, but they also contain a confirmation of payment of all wages owed. (Fox Decl. ¶ 8 and its Ex. 1 at 2, 4-5; App. at 13-15, 21, 23-24)  The agreements provide various defenses to Plaintiffs' claims *on the merits* and also show Plaintiffs are not "similarly situated," particularly because none of the named Plaintiffs signed severance agreements.  *See O'Connor v. Boeing N. American, Inc.*, 197 F.R.D. 404,

-22-

Case 8:07-cv-00342-CJC-MLG   Document 147   Filed 03/02/09   Page 27 of 31

411 (C.D. Cal. 2000) (in applying defense, court considered factors varying from individual to individual).[25]

These matters go to the heart of Defendants' right and ability to defend themselves against Plaintiffs' claims. The right to present all available defenses is of constitutional dimension, and cannot be sacrificed or truncated in the name of the "efficiency" promised by class counsel.[26] Fundamental fairness requires that these and other defenses to Plaintiffs' FLSA claims not be herded into a collective action for aggregate disposition.

### 5. Fairness and Procedural Considerations Cut Against Certification

This case would be utterly unmanageable to try as a collective action because there is no efficient or fundamentally fair way to identify, let alone measure, Plaintiffs' alleged "lost" overtime. In this case, Plaintiffs have failed to offer any contemporaneous record of their alleged "lost" overtime. Several Plaintiffs testified that they are relying on memory to calculate the amount of pay they are allegedly owed (Lorts 35:23-36:8; App. at 77; Karalis 67:12-68:6; App. at 107) and would be

---

[24] The named Plaintiffs all admitted they may have *overreported* their work time on occasion. (Schueler 209:7-14; App. at 147; Karalis RFA 16; App. at 199; Figueroa RFA 16; App. at 177)

[25] *Bernard v. Gulf Oil Corp.,* 841 F.2d 547, 551 (5th Cir. 1988) (plaintiffs who refused to sign releases lacked standing to challenge the validity of releases executed by putative class members they sought to represent).

[26] The Supreme Court has held a civil cause of action to be a species of property protected by the due process clause. *Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 428 (1982); *Phillips Petroleum Co. v. Shutts,* 472 U.S. 797, 807 (1985) ("a chose in action is a constitutionally recognized property interest"). This property right "includes any substantive defenses created thereunder." *Lusardi v. Xerox Corp.,* 118 F.R.D. 351, 371 (D.N.J.1987) ("defenses available to [the defendant] constitute a protected property interest under the Fifth Amendment"); *Walker v. Mountain States Tel. & Tel. Co.,* 1988 WL 1000060, at *2 (D. Colo. 1988).

1    "guessing" as to the amount.  (Badorek 62:18-63:9; App. at 158; Schueler 147:2-14;

2    148:4-149:4; App. at 143)

3        Thus, there is no means to determine liability (or damages for that matter) in

4    genuinely collective fashion, which precludes class treatment. *Smith*, 2007 WL

5    2385131, at *8.   Plaintiffs may argue that the Court can look at telephone log in or

6    building access data to determine whether any Plaintiff worked overtime.  (Schueler

7

8    Decl. ¶ 17; App. at 68-69)  In order to receive calls from prospective customers and

9    sell loan products, loan officers logged on to the telephone system. (*Id.*)   Loan

10   officers also had a security card which they could use to enter a building.[27]   (*Id.*;

11   Agnell 62:6-8; App. at 39; Sathoff 102:16-103:8; App. at 102)  While loan officers

12   recorded their own time in the time entry system, Plaintiffs claim the "log on/off"

13   times from the telephone system and the time in which they entered a building, were

14

15   better indicia of their hours worked.  (Schueler Decl. ¶ 17; App. at 68-69)[28]

16       However, that analysis (or consideration of any other time stamped data)

17   would require the factfinder to weigh multiple levels and sources of competing

18   "evidence" of work time: anecdotal, time entry data (Peoplesoft), telephone system

19

20   _____

21   [27] However, the security card was not required to exit the building. (Figueroa RFA 43; App. at 181)  Moreover, the card was not even required to enter, because a group of loan officers could enter together. (Schueler 206:1-11; App.

22   at 147; Badorek 65:13-20; App. at 158)

     [28] That data is not necessarily dispositive to the number of hours worked and is limited in what it can show.  The

23   data only shows when the loan officer logged on or off of the telephone system, or used the access card to enter the building.  (Agnell 61:16-62:8; App. at 38-39; Sathoff 96:7-97:6; 99:14-100:5; 102:24-103:8; App. at 100-02)   For

24   example, a loan officer may log on to the telephone system and then leave the office – without logging off.  Figueroa and Karalis admitted that they failed to log out of the telephone system at the end of the day at least once. (Figueroa

25   _____

-24-

DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DECERTIFY CONDITIONAL FLSA CLASS; CASE NO. SACV07-342 CJC (MLGx)

1  data, and building access data.   This alone is enough reason to decertify, as

2  exemplified in the following:

> 3  The Plaintiffs propose to prove hundreds of small overtime claims by
> 4  "computer activity reports, date and time stamped email, and phone records
>    proving that Plaintiffs were working before and after the times recorded on
> 5  their timesheets."... Presumably, this must be done for hundreds of loan
>    officers for every day for a two year period … The proposed collective action
> 6  does not permit the efficient resolution in one proceeding of common issues of
>    law and fact arising from the same alleged activity.

7  *Accredited Home Lenders*, 2006 WL 2085312, at *4, *5.

8  Because no jury can reasonably be expected to comprehend and evaluate such

9  voluminous and disparate evidence, this case is not amenable to class treatment and

10 should be decertified.   No matter how the jury might be instructed, this is the

11

12 hallmark of a case that cannot be *fairly* tried as a class action.

13                         **V.    CONCLUSION**

14 For the foregoing reasons, the Court should grant Defendants' Motion to

15 Decertify the Conditional FLSA Class.

16

17

18

19

20

21

22

23

24 RFA 41; App. at 179-80; Karalis RFA 41; App. at 201)  Schueler admitted it was possible that she failed to log out. (Schueler RFA 52; App. at 233)   If anything, the telephone data may indicate the *ceiling* for work time.

25

DATED:  March 2, 2009          /s/ Nicholas L. DiVita
                               _____
                               NICHOLAS L. DIVITA
                               JOCELYN A. VILLANUEVA
                               STACEY R. GILMAN
                               LOGAN W. OVERMAN
                               JENNIFER B. WIELAND
                               BERKOWITZ OLIVER WILLIAMS
                                  SHAW & EISENBRANDT, LLP
                               2600 Grand Boulevard, Suite 1200
                               Kansas City, Missouri  64108
                               Telephone:  (816) 561-7007
                               Facsimile:  (816) 561-1888
                               E-Mail:     ndivita@bowse-law.com
                                           jvillanueva@bowse-law.com
                                           sgilman@bowse-law.com
                                           lwoverman@bowse-law.com
                                           jwieland@bowse-law.com

                               LINDA MILLER SAVITT
                               JEFFREY P. FUCHSMAN
                               BALLARD ROSENBERG GOLPER
                                  & SAVITT, LLP
                               10 Universal City Plaza, 16th Floor
                               Universal City, California  91608-1097
                               Telephone:  (818) 508-3700
                               Facsimile:  (818) 506-4827
                               E-Mail:     lsavitt@brgslaw.com
                                           jfuchsman@brgslaw.com

                               **ATTORNEYS FOR DEFENDANTS**

## **PROOF OF SERVICE**

The undersigned hereby certifies that a copy of the foregoing was filed electronically with the United States District Court for the Central District of California Southern Division on this 2nd day of March, 2009, with notice of case activity generated and sent electronically to:

Robert W. Thompson (SBN 106411)
Charles S. Russell (SBN 233912)
Callahan, McCune & Willis APLC
111 Fashion Lane
Tustin, California 92780
robert_thompson@cmwlaw.net
charles_russell@cmwlaw.net

Morris J. Baller (SBN 048928)
Laura L. Ho (SBN 173179)
James Kan (SBN 240749)
Goldstein, Demchak, Baller, Borgen & Dardarian
300 Lakeside Drive, Suite 1000
Oakland, California 94612
mballer@gdblegal.com
lho@gdblegal.com
jkan@gdblegal.com

Claudia C. Bohorquez (SBN 150647)
Law Offices of Claudia C. Bohorquez
3500 W. Olive Avenue, Suite 300
Burbank, California 91505
ccblaw@aol.com

**Attorneys for Plaintiff, Melissa Schueler, et al.**

BERKOWITZ OLIVER WILLIAMS
SHAW & EISENBRANDT LLP

By: /s/ Nicholas L. DiVita